## Oyer and Terminer.

## SCHOHARIE, (N. Y.) Sept. 12th, 1817.

The People
v.                   } MURDER.
*Abraham Kesler.*

This day the prisoner was brought to trial on an in-
dictment for the murder of Catharine Kesler, his wife.
The indictment contained two counts : one for adminis-
tering white arsenic, and the other for administering
laudanum, at the town of Middleburgh, in Scoharie
county, on the 10th of November, 1816, of which she
died on the 15th of the same month.

### Evidence for the Prosecution.

*Catharine Best.* Witness knows the prisoner; she
thinks he came to her house, in the town of Middleburgh,
on the 17th of November last ; with him was a lady he
called his wife ; she recollects it was on a Sunday evening
about 8 o'clock ; they went to bed without having any
thing to eat or drink, that witness knows of; it might
have been 9 o'clock before they retired to bed; after
witness had been in bed for some time, it might have
been 1 o'clock, prisoner and deceased both came through
the room to go out doors, and the witness asked what
was the matter with the lady ? Prisoner answered that
she was taken unwell with violent puking ; they return-
ed to bed, and afterwards went out several times ; pri-
soner told the witness that she also had a purging. After
they had been out twice or three times witness got up
and handed the prisoner a chamber vessel for the decea-
sed to use. Prisoner got cold water for her several

times; witness told the prisoner she was willing to wait upon his woman, and do all she could, the same as if she was one of her own family; prisoner answered it was not worth while, he had nothing to do, and that he could as well do that as nothing. The next morning early witness went to the bed-side and asked the deceased how she was; she said she was a little easier; that she had a bad pain in the stomach and in her head. Witness left the bed-room, and prepared some tea and bread and butter; offered it to her, but she had no appetite, and witness did not observe her to eat at all; prisoner was in the bed-room at the same time: the deceased was very thirsty, and he procured her water, and gave her tea also to drink. Witness says the deceased and prisoner both reckoned it was the hystericks. Witness sent for Elizabeth Spoor; but previous to sending for Mrs. Spoor, prisoner said the deceased was subject to hystericks and fits. Witness said she had no fits as she observed. Mrs. Spoor came; rubbed her stomach, and said it was not hystericks that ailed the woman; she returned home, and was sent for a second time, by the desire of the prisoner, who said it was a continuation of the hystericks; it was then near 12 o'clock. During the day she grew worse with pains in the stomach and head; she perspired very much; she complained of a burning heat in her breast and stomach: by spells she complained of cold chills; these chills were accompanied with sweats. Mrs. Spool came the second time, and again rubbed her stomach, but it appeared to produce no effect; she still continued to complain; and whilst the prisoner was in the room Mrs. Spoor said it was not hystericks—the deceased still continued thirsty, and remained in the same situation until 9 o'clock in the evening, when witness retired to

SCHOHARIE
1817.

The People
v.
Kesler.

The People
v.
Kesler.

her bed. The deceased and prisoner had a candle in the room when witness retired to bed. The second morning she appeared to be some better, but continued to complain of the pain in her stomach and a burning heat. Witness spoke to prisoner, and wished him to send for a physician; he said he did not think it would be of any consequence. She mentioned it to him several times, and told him if it was her case she would send for a physician. He said it was of no consequence, she was subject to it; and whenever she had been in a fit it would go over. He at length went for a physician, but whether it was that day, or the day following, she cannot ascertain. In the afternoon of Tuesday she was taken with more violent pains: prisoner said she had puked, but witness said she had not observed it: at intervals during her sickness she had cold chills and sweats. On Tuesday prisoner said she had eat a little, he had carried it in for her. On Tuesday night witness proposed to have persons to watch with her; but prisoner said he had to be up with her himself, and it was not worth while to disturb the family of their rest; if any thing was wanting he would call on witness. The next morning the deceased was much better, and came and sat with her in her room; it was early in the morning, before breakfast. The deceased complained of a trembling in her limbs, and said she could not bear to be up long: she did not complain of much pain that morning; she remained up about fifteen minutes; complained of a dizziness in her head: afterwards she again got up, said she was so tired of lying, she would try to set up a little while. During this time witness thinks prisoner had gone to the doctor's; she washed herself, complained of a dizziness in her head, and said she had to lie down again.

On Wednesday, in the forenoon prisoner said he had
given her a puke, and witness thinks she heard some one
puke in the room where the deceased was lying. In the
afternoon of Wednesday she grew worse and complained
of burning heat and thirst as before. Witness then told
prisoner that a physician ought to come and see her: pri-
soner said it was not worth while, it would only make a bill
of expense ; she was used to such turns, and would not get
well until she had had a fit. Prisoner was most of the
time in the room alone with her. On the evening of
Wednesday the deceased was taken very ill, and com-
plained of more distress in her stomach ; she said her
whole body was in distress and pain. She was at times
heated, and threw off her bed cloths, and then again
complained of cold, and covered herself. She called
for her mother ; witness asked prisoner who she meant;
he said she meant *his mother, because she thought much of
her, and that she had lived with her : Prisoner told wit-
ness they were from Rome.* She was in continued dis-
tress on Wednesday night until 12 o'clock, when witness
left the room. On Thursday morning she was at times
deranged ; she continued to call for her mother and
brothers. On Wednesday night she requested prisoner, if
she died, to return her to her friends to be buried; he said
it should be done. Witness asked prisoner whether the
brothers she called for were her own brothers ; prisoner
said they were step-brothers ; and in answer to witness'
questions, said her father and mother were dead. On
Thursday he went for a physician, but did not fetch one;
and said, on his return, he had given her medicine ; but
witness observed she was much worse after it. Witness
told prisoner she would give her no more medicine, as
the deceased was much worse after it. He answered, he

SCHOHARIE
1817.

The People
v.
Kesler.

did not think he would give her any more; and after-wards on being asked by witness, who observed she was worse, he told witness he had given her more medicine; she eat some buttermilk soup on Thursday: *Prisoner told witness he had given her opium.* From Wednesday night witness thought she could not live; deceased said she would die; but prisoner said she had such turns be-fore, and recovered; and the deceased replied she would never see her friends again; *and said she was not then as she had been before, and that she would die.* Prisoner said he wondered why the doctor did not come; and in the afternoon of Thursday he went for a physician, and in the evening Doctor Barton Carpenter came and went into the room where the deceased was, staid a while, and then went off. The doctor asked witness how long the deceased had been so ill; she said since Wednesday night. The doctor said if he had known it he would have visited her before. The doctor resided about two or three miles from that place. Prisoner had persons to watch with her on Thursday night: on Friday she could not speak so as to be understood; and she died about 7 o'clock in the even-ing, which was the 22d of November. On Friday he again went for the doctor, and left word that she should be attended to if she awoke in his absence, as she ap-peared to be asleep at the time; but the doctor did not come that day. After her decease her hands and nails were very blue—it was a purple blue. A Mrs. Wilsey dressed her head, and said, see how her hair comes out. She was buried on Sunday; on Saturday morning she appeared blue round her mouth and eyes. After her death witness asked her maiden name, and prisoner said her name was Caty Sprucher; on being asked whether Jost Sprucher was a relation, prisoner said *none that he knew of; he might be a distant relation.* Witness said

there was a sister of Jost Sprucher married in the neigh-
bourhood to one Lawyer; prisoner said they might be
distant relations; he was not much acquainted with
the Sprucher family.  *Witness also named a Scha-
fer, who had married a daughter of Jost Sprucher;
also mentioned one George Sprucher, who had livid at
Bowman's Kill, in Canojaharie, but who was then dead;
prisoner said he was not much acquainted with the Spru-
cher family; they might be distant relations.*  Witness
said that those relations might be sent for to attend the
funeral.  Prisoner said it was not worth while; *he did
not know they were related; it might be they were dis-
tantly.*  Witness asked him before this whether he was
going to carry her corpse to her relations, as she had
spoken of or requested.  He said no, he believed not,
he would have her buried in the neighbourhood there;
it was not worth while to go to the expense and trouble.
She was buried on Sunday afternoon, and prisoner re-
mained until Monday morning, when he went off, after
breakfast, towards Catskill.  He left the clothes of the
deceased and requested the witness to take charge of
them.  *There was no medicine administered to the deceas-
ed by any person except the prisoner, to the knowledge of
the witness.*

On being cross-examined, the witness said, that she
heard no complaint of indisposition when the deceased
first arrived at her house; nothing called for before they
went to bed, that she knows of.  She is certain he told
her it was a puke which he had given her on Thursday.
There remained some of the medicine, which witness
wrapped up in something; this medicine was a kind of
powder, and some dark stuff which looked like opium.
The deceased walked out on Tuesday or Wednesday

with the prisoner, who asked the witness whether she thought the deceased could bear it; witness said she thought it would do her good: they were out about half an hour. or a quarter of an hour: after he had mentioned to the witness that he had given her a puke, she does not recollect to have observed that she puked afterwards. Witness recollects that during the time of her sickness prisoner combed her hair. At one time prisoner, on being asked, said *it was his mother she inquired for*; and at another time, that it was *her mother-in-law*. Does not know whether he went to the doctor on Friday afternoon. Thursday at intervals she slept a great deal; sleeping and waking alternately. The deceased was interred at the burying place at John C. Spoor's.

*Hannah Boyce.* Witness has heard the evidence of Mrs. Best, and as to the symptoms, she agrees with her; she recollects to have remained in the room on Wednesday night after Mrs. Best went to bed; she staid a spell, and prisoner told her she might go to her bed, he could stay with her himself. On Thursday before daylight, he called witness up, and requested her to attend to his woman, whilst he went to the Doctor's. Prisoner told witness, that on the night of Thursday she had a fit before he called witness up—she was frequently taken with extreme pains and burning heat: on Thursday morning he gave her some fine white stuff, and the prisoner said there was opium in it; he put it in a tea saucer and put tea with it; he mentioned that the doctor had said that she must have some herb tea, and asked witness to make it; and about half an hour after the deceased had taken his mixture she was worse; but does not know that she puked that day: on Thursday she was delirious the greater part of the time. Witness

heard him say several times he had given her medicine, and always after it was taken worse.   Witness made rue tea for her; the deceased had some in her bundle; it was rolled in a paper; prisoner told witness where to get it; it was dry rue : the hands and nails of the deceased, after death, were purple.

On her *cross-examination* this witness says, she knows it was rue, and is certain that it was a powder; the powder was given in the morning.   Witness thinks it smelled like camphor, which she perceived when the prisoner put it in a tea saucer.

*Doctor Barton Carpenter.*   Witness has seen the prisoner before; resides 2 or 3 miles from Best's, where the deceased was; and saw him for the first time, during her illness; he called upon him for medicine, and asked him for opium and some other medicine.   Prisoner gave witness a description of her case; he said his wife had taken cold; *and it was at a time she usually was unwell; and that at those times she was in the habit of taking opium, and that she could not well do without it.*   He then asked for a puke and two potions of physic, and some fever powders : he stated one of the potions was for himself, that he also was unwell.   Witness gave him opium : *he said he wanted not only enough for that time, but some to take along on the journey.*   Witness thinks it was on Monday or Tuesday.   He gave him half an ounce of opium; one dose of emetic tartar; two potions of physic, in the form of pills, the ingredients of which were jalap and aloes, such as are ordinarily administered.   Witness gave prisoner a large dose for himself.   The fever powder was composed of *opium, camphor, and emetic tartar* : prisoner had three or four of them; he took his medicine and went off, without asking the wit-

ness to come and see the deceased. When he came again the next day, or the next but one day, he said he wanted some more opium and powders; and stated that the deceased had eaten of the opium first given, but it, had been lost in the chamber pot. Witness then made up some more fever powders, and prisoner requested him to put a considerable share of the opium in the powder, as she was in the habit of taking opium, and a small quantity would be of no use. Witness prepared and delivered five or six of the pills to him, and he said no more about the opium : prisoner said his wife was no better, but rather worse. He came afterwards, being the third time, in the night, after witness had been asleep, and wanted some more medicine; thinks it was another puke, which witness gave to him, and when he went away, he stated to the witness that if he did not call over again by 12 o'clock the next day, he wanted witness to come over and see the woman : on the next day, being Thursday, towards night, he then requested witness to come over and see her. At one of the prisoner's calls upon the witness, he mentioned she was very thirsty. Witness went over on Thursday, a little after sunset, and on seeing her thought her past recovery. The deceased complained of a severe pain in the pit of the stomach, and of a soreness in her stomach so that she could not bear the bed clothes on her; her extremities were cold, her pulse was fluttering, intermitted and very feeble ; her countenance was ghastly, like that of a person in the agonies of death. *Prisoner told this witness that he was going to Hudson.* The witness left the patient a powder or two of an anodyne nature, and then went home ; does not know he directed the prisoner at any time to make rue tea.

*On his cross-examination,* this witness says he direct-ed the prisoner to give the powder in herb tea. The pills were jalap and aloes, and something of an aromatic nature: does not recollect how many pills he gave the prisoner in all ; cannot speak with certainty the days he called the first and second times on him. Witness saw no symptoms which led him to believe she was dying be-cause she had taken too much opium. Witness never has been called to visit a person poisoned by arsenic ; he keeps his emetic tartar in a large phial, and his cam-phor in a bottle ; he only keeps the necessary medicine to use as a physician : witness had arsenic in his shop ; his medicine is left in an open room in his house, but no person handles it. The four powders he gave prisoner were calculated to produce sweating: in leaving the same powder when he visited the deceased, with those before given to the prisoner for the patient, his only ob-ject was to allay pain ; the powders given by him to pri-soner would not produce the symptoms stated by Mrs. Best. Witness *states that his arsenic is kept in a corner drawer, and that it is not possible he could have made a mistake : the witness is perfectly certain he did not.*

*John C. Spoor.* Witness saw where the deceased was interred ; it was near his house in the burying-ground for the neighbourhood : her corpse was dug up about two months afterwards, to be opened. One Esquire Subar and one Adam Garlock were there at the time. Witness says he pointed out the spot to Subar and Garlock.

*Adam Garlock,* jun. Witness was present at the time she was taken up ; Spoor showed him the spot ; she was carried to the widow Spruchers, the step-mother of the deceased, lying in Freysbush, near Bowman's kill ; the

father's name of the deceased was George Sprucher, who lived and died at Freysbush, near Bowman's kill; the mother and child of the deceased had been buried there, and Jost Sprucher was her uncle. At this place the body was opened, Doctors Miller, Atwater, Joseph White, and Delaus White were there at the time. Witness knew her, and has no doubt it was the body of Catharine Kesler.

Dr. *James W. Miller.* The body was opened by Dr. Delaus White; the external appearance of the stomach and bowels showed there had been morbid action; the stomach was removed and opened, and on examining the inner coats of it, there appeared to have existed an inflammation; there was a small quantity of fluid in the stomach of a very dark appearance. Witness discovered some particles attached to the inner coats of the stomach, and some of them had penetrated into it; he also found some of the particles in the smaller intestines, and some of them appeared to be between the coats of the intestines. Those particles were of a vitreous appearance, and when mashed with a knife they were white inside. Some of those particles were placed on heated iron and a dense white fume arose from their combustion; some of them were placed between two plates of polished copper prepared for the purpose; the two plates were bound by an iron wire, and were then placed on the fire until they were brought to a red heat; they were then removed, and after being cooled they were separated; the interior of the plates towards the edges of them were whitened in a circular form. Witness took a small quantity of the contents of the stomach home with him in a phial, perhaps about two tea-spoons full of it, and that contained some of the particles. On his return home he placed it

in his desk ; and in consequence of the sickness of some of his family, his experiments were not made until some time afterwards. Witness then diluted it with a pint of water, and took the nitrate of silver, dissolved it, and put it in a separate glass ; took pure ammoniac in another glass, then took two glass rods, wet the end of one of those with the solution of the nitrate of silver, dipped the end of the other in the pure ammoniac, brought the two ends of the glass rods, so dipped, in contact on the surface of the water in the vessel containing the contents of the stomach, passed them down into the fluid, and there was a precipitate which was of an orange colour ; which experiment he repeated a number of times, and also with a solution of arsenic, and the result of the experiments were similar ; the same precipitate in each, although the one made with the solution of arsenic was more distinct ; the liquid in fluid being colorless it was clearly perceptible in the contents of the stomach ; and in his opinion there was arsenic in the stomach. The last test is relied on as much as any one, and it is considered the most delicate test ; it is his opinion, and he does not know he has any doubt of its being arsenic. Witness does not know of any thing which will produce a similar effect with the experiments with the plates of polished copper, except it be arsenic itself ; charcoal and oil will produce a result something like it, but the whitish color is easier removed ; the fume proceeding from the heated iron beforementioned, was like that of burning arsenic on heated iron. Some spots of the corpse were more livid than others. Burning heat, vomiting, cold sweats, pain in the stomach, as mentioned by Mrs. Best, are the usual symptoms attending being poisoned by arsenic. He also saw an ap-

pearance in the stomach resembling opium long lain in water; it was the rosinous part of the opium which never dissolves in water. The color of the contents of the stomach was much changed in consequence of the long period of interment. Thinks the particles were placed near the centre of the copper plates No charcoal put with the particles; nothing but the particles and what might have adhered to them.

On his cross examination, witness said the copper plates were not luted; in those experiments the copper is generally whitened where the arsenic lies; he has never tried a similar experiment with the emetic tartar. Witness thought in this instance the white parts on the plates grew whiter by rubbing; they had the appearance of being a little whitened at first before they were rubbed. Witness has seen the plates pretty dark on the surface; is not certain, but thinks they would be darker with less heat.

The experiment with the glass rods is called Marcet's experiment. Witness never tried the last experiment before on the contents of the stomach; never tried this same experiment with any other matter to ascertain whether it would not produce the same result. Witness has never seen the note by Marcet himself, in which he acknowledges it to be very uncertain. Arsenic does not readily dissolve in water, it generally requires a degree of heat. The mucus in the stomach might impede the dissolution of the arsenic by being coated over it: mucus is generally moist. Witness has never been called to a patient poisoned by arsenic till after death. Witness says puking on Sunday evening from poison by arsenic, is not usual to experience ease so soon as the next morning. He cannot say he discovered a garlic

smell which usually accompanies tne experiment with
copper plates. The appearance of fumes is one test,
the smell of garlic is deemed another test; in this in-
stance there was tar burning in the room; the smell of
the corpse and the tar might have prevented his disco-
vering it. The puking, purging, and pains, and the con-
tinuance of them, he deems an evidence of its being ar-
senic; the opium might allay it. Witness says arsenic
is a mineral poison, and of a caustic nature, and when-
ever it comes in contact with the stomach it corrodes it.
A full portion taken on Sunday evening, no medicine
would have prevented the puking so soon as Monday,
unless a part had been thrown up. Witness has known
a person lay twelve or fourteen days, although taken
with violent puking at first. With that patient, on tak-
ing the second dose, it did not excite puking, which he
attributes to the loss of action in the stomach. The
acid of the arsenic when moist will turn iron black.
The experiments, as stated and made by him, have ge-
nerally been relied upon. Any animal matter, such as
mucus, combined with arsenic, he thinks would produce
that effect on the copper; and in this instance, he thinks
the mucus combined with the particles produced the
effect on the copper, because it requires the presence of
some inflammable principle to produce that effect on the
copper; whether there is a disposition in the arsenic to
pass off, or not, he cannot tell; the outer edges of the
plates of the copper may have been closer than the cen-
tre, and thus confined it.

*Delaus White*, a physician. Witness first noticed the
general appearance of the surface of the body; found
in some places a dark livid appearance, particularly in
the abdomen. Then the internal parts were exposed :

SCHOHARIE 1817.

The People v. Kesler

found the stomach and intestines in a highly inflamed state; the contents of the stomach were then removed and examined, where he found particles, some of them had penetrated the internal coats of the stomach; likewise found what he supposed to be opium in the stomach, a considerable quantity, and it appeared as though it had been macerated; then examined the intestines; found those white particles, and also opium; some of the particles in the inner coat of the stomach were removed with the point of a knife, and put upon a hot iron; a white fume was evidently perceptible; the garlic smell was not discovered by him, which he attributes to the smell of the corpse and the burning of tar in the room.

The experiment was then made with the copper, as stated by Dr. Miller, and the result was the same; witness then took the contents of the stomach home, and some time after (how long he cannot tell) boiled the contents in water; after this they endeavoured to filtrate it, but it was left so turbid, that their subsequent experiments were indistinct. They tried the experiment mentioned by Miller; there was an appearance of precipitate, but not satisfactory, which he attributed to the turbid state of the contents of the stomach. They then tried an experiment with arsenic and other copper plates, and the result was similar to the experiments made with copper before, except that the whiteness did not appear circular, but the spots where it did appear were the same. His opinion is, the particles were arsenic, and supposes the experiments made by Dr. Miller, are infallible—they are so considered. The symptoms of being poisoned by arsenic, are a burning pain in the stomach and intestines; oppression in the chest, thirst, cold sweats and chills, and coldness of extremi-

ties. He relates this from authors read by him : also SCHOHARIE
livid appearance ; the hair frequently falls out.

This witness on his cross-examination said, that the
whitening of copper he thought strong evidence of it,
and burning on the hot iron satisfied him; he thinks the
smoke in the room did not prevent their perceiving the
white fume. The copper experiment made at home
with the white arsenic produced the same result ; he
used the same quantity as near as he could judge with
the particles before tried ; witness has been called to
visit a patient poisoned with arsenic, but he was dead
before he saw him or came there ; in this instance there
was about half a gill of the contents of the stomach
which he took home with him. Witness did not sepa-
rate the coats of the intestines ; some of the particles
he took out of the intestines had nearly penetrated to
the external coats. The contents of the stomach, after
being boiled, had a greyish appearance, which witness
attributed to the mixture of opium ; it was not the rosin-
ous part which disturbed the water, it was the dissolved
opium. Witness does not believe that every part of
opium will dissolve in the stomach ; he tasted it in this
instance himself, and is fully satisfied it was opium. He
found in the intestines what he thought was camphor.
When muriatic acid is present in the test with a glass
tube, white precipitate will appear.

Dr. John Atwater. Witness was the coroner who
presided at the opening of the body ; he saw the experi-
ment made with the copper; the result was as stated by
doctors Miller and DelausWhite. The external coats
of the stomach were highly inflamed; also the internal
coats. Witness observed the particles, some of them
were nearly the size of the head of a pin, he mashed

some of those particles on white paper ; says it had the appearance of arsenic.   The white fumes are considered a test ; witness says he does not know that he has a doubt of its being arsenic.   Arsenic will produce high inflammation, and terminate in gangrene.

On his cross-examination this witness said, that the acid of the stomach after death would exode the stomach ; witness saw the appearance of gangrene only in one place    The body was considerably distended.

Dr. Joseph White.   Witness was present at the opening of the body, at the request of John Suber and a Mr. Van Alstyn ; witness knew her before ; she had a scar on one of her arms, which he found ; he has no doubt but that it was the body of Caty Sprucher ; the body was livid, swollen and far advanced in a state of putrefaction. His son Delaus White, opened the abdomen in his presence, both orifices of the stomach were tied to preserve the contents, the stomach was then removed and put into a bowl ; his son then proceeded to open it ; he found it to contain a small quantity of turbid dark yellow fluid approaching to brown in that fluid ; and also attached to the coats of the stomach, he discovered a tenacious, gummy substance, resembling opium long immersed in water ; he also discovered a number of hard particles resembling some mineral substance ; many of those particles were deeply imbedded in the coats of the stomach ; at the first view they had a yellowish appearance, but on being removed and broken with a knife, they appeared white ; the same appearance of particles he discovered in the smaller intestines from one to two feet from the orifice of the stomach.   They then put some of the fluid of the stomach into a phial, containing a solution of the sulphate of copper and subcarbonate

of potash ; this mixture after standing for a time produced a copious precipitate ; that precipitate, however, was darker, and that portion of the fluid above the precipitate was also darker than what takes place in the process for making Scheele's green.   Scheele's green is made with the same mixture except the addition of arsenic.   Witness then proceeded to examine the particles, and found them principally on the posterior internal surface of the stomach, some of the particles were collected ; some mucus was attached to them ; some of them were placed on a heated iron ; when the ignition took place, a white smoke ascended from the iron ; at this time the stench of the stomach was such, that they were obliged to burn tar to render their situation tolerable.   They collected more of those particles, placed them between two smooth plates of copper prepared for the purpose ; they had no means of luting the copper ; but after closing them with wire, they were put in the fire and heated red hot, took them out and cooled them ; when cooled they were separated.   On examining them, the centre of the two pieces were not materially whitened ; but in a circle some distance from the centre, on both plates of copper, was considerably whitened, and had the appearance of tin exposed to the air for some time ; those are all the tests on which he places any reliance—says the precipitate will drop on tartarized antimony.   The fluid, or remaining contents of the stomach, was then put in a bottle under lock and key ; some weeks afterwards that was put in a quart of boiling water, and witness made the experiment stated by Miller, with glass rods ; but the turbid state of the water prevented his discovering the orange color ; in the precipitate there was a copious precipitate.   Witness

then took a solution of arsenic, to that he added a small quantity of the subcarbonate of potash, and a tincture of opium, to bring it like the color of the fluid of the stomach; he then took a piece of the nitrate of silver, and brought it in contact with the surface of that mixture ; the precipitate fell, the same as in the water in which the stomach had been immersed, and with the same appearance ; and such was the color of the water in both cases, that he could not discover the orange appearence of the precipitate in either ; but says he has no confidence in these last experiments. He also made the experiment with arsenic and copper, and found the same white appearance in irregular spots, but not circular. Charcoal and oil will produce this white, but you may rub it off; whereas arsenic whitens by rubbing ; says it could not be charcoal and oil. Witness does not consider himself a chemist, not having been bred one, he therefore does not like to give an opinion ; says he has seen but one patient in life who had taken arsenic ; and he deems thirst, puking, pain in, and a heated stomach, to be the symptoms of a person poisoned by arsenic ; says a patient in severe pain can bear a great quantity of opium, but half an ounce would kill any human being without he was a Turk, and thinks it would kill him ; it would kill twenty persons unaccustomed to take it ; that deceased had opium in her stomach. Emetic tartar will produce a precipitate, but it will be black, and he saw nothing like black in this precipitate. He knows of nothing which will produce the same effect produced by the experiment with polished copper, except it be arsenic itself.

This witness on his cross-examination says, that there is no acid which exactly resembles the acid of the sto-

mach. He supposes that emetic tartar mixed with the

acid of the stomach would not change the usual black
color of the precipitate; thinks half an ounce of opium
would kill a person in twelve hours. He says taking a
great deal of water might wash the particles off of the
stomach, and the puking might cease if the patient
puked immediately. A great quantity of arsenic taken
at once would be more liable to be thrown off of the
stomach than a less, and therefore not so dangerous.
Opium would allay the spasms of the stomach, and by
that means have a tendency to prevent puking; it would
increase the thirst; thinks it would tend to prolong life
in the patient. Witness does not discover any thing in-
consistent with the idea that she died by taking arsenic
and laudanum, from the symptoms stated by Mrs. Best
in her testimony. Her sleeping one day, as stated,
would appear to be the effect of opium. Opium some-
times produces puking in a patient with irritable nerves;
in hysterics it will sometimes produce that effect.

*Dr. James Hadley.* Witness is a professor of chemis-
try at Fairfield; he has heard the testimony of the phy-
sicians; from the result of the experiments stated as
having been made with polished copper; the particles
must have been arsenic; he has no doubt of it. Wit-
ness thinks the precipitate stated by Dr. Miller which
appeared from the experiment, as stated by him, with
the glass rods is characteristic of arsenic.

*Eve Sprucher.* Witness is acquainted with the pri-
soner; she has known him more than six or seven years;
she is the widow of George Sprucher, who is the father
of the deceased, and lives in the town of Canajoharie
near Bowman's Kill. Prisoner married the deceased
about five years ago last spring; witness is her step

SCHOHARIE
1817.

The People
v.
Kesler.

mother; the deceased had a child by the prisoner before she married him; he refused to marry her at first; there was some difficulty; he gave security for the payment of some money, and he afterwards married her; they were married at witness's house; he came there and talked to her about marriage after she had a child, and after he had been sued, and a day or two after he called on her they were married; this was after he had agreed to give her a certain sum of money; he staid with her one night after marriage, and then went off; he came the next day or the day but one after, for the notes he had given for the payment of a sum of money; he then said he had enlisted, and went off as a soldier. The deceased once went away from witness's house in the summer, and returned at Christmas; it was after prisoner came home out of the army; witness did not know where she had been. After the prisoner got through his time of service as a soldier, he returned to the town of Canajoharie, but did not call to see the deceased until last November the 16th, and the deceased mentioned in prisoner's presence that he wished her to go along. Witness asked him what he would do with two wives, she had heard he had another? he smiled and said, folks said so. He came to witness's house about breakfast time, and left there after 12 o'clock with Caty; she went on horseback, and he on foot; they were together in a room for some time before they went off; they took the road to Cherry-Valley. Witness says she knew the corpse to be her daughter Caty's.

This witness on her cross-examination says, the deceased was subject to fits once in a while, called hysterics; she would sometimes fall down with them. Pri-

soner was twice at the house after he left the army, and before he took her away ; witness stood in the door and saw them go off. She does not know that he slept with her more than once. Witness's son was at home when prisoner went off with Caty. Witness received no word of her step-daughter's death. The deceased never took opium as she knows of. Witness first heard of her death from her brother-in-law ; found her clothes at the house where she died.

*Joseph Whilso.* Witness was acquainted with Caty, the deceased, and was at Mrs. Sprucher's before the time of the marriage. Prisoner came there and requested witness to speak to her, and said he had calculated to marry her, he felt himself uneasy ; that he meant to live with her, and requested witness to speak to the old lady ; witness said he would, and did so ; he also asked witness to speak to Caty ; witness said that was not his business, and then went off. Prisoner told witness, after he had been in the army, he wished he had paid the money instead of marrying the deceased, and said he was then willing to do it, if he could have a bill of her.

On his cross examination, this witness says that he hired the prisoner to work, after he had been taken prisoner as a soldier, and whilst he was on his parole, about one year after he had been married ; he then told witness he would not live with her. Witness did not then know the deceased was subject to fits, but after that he saw her in a fit, and it lasted about fifteen minutes ; she complained immediately afterwards, but continued about her work.

Dr. Barton Carpenter, again called. Witness says

prisoner came to his house on Friday and told him his wife was much better ; said he thought in a day or two she would be able to proceed on her journey. It was late in the afternoon of the very day she died ; he asked for the same medicine witness had left the evening before, and said those powders had helped her ; witness then gave him two or three of the powders.

Henry J. Yordan. Prisoner is his brother-in-law ; witness was present at the marriage ; next morning witness saw him at the house of Mrs. Sprucher, and asked him whether he had taken up the obligations which he had signed with him. Does not know whether he said that he had burnt them, or that Suber was not there yet. Prisoner told him the next morning, that he either was enlisted, or that he intended to go down to enlist. Prisoner, before the marriage, the same night it took place, said he would marry her, but he did not think he would live with her.

Joseph Sparks. Witness knows the prisoner, and enlisted in the army about the same time he did ; and after they were with the army, prisoner told him he would not live with her, and he wished that she was out of the land of the living ; said he enlisted on purpose not to live with her. This was before either of them left the town of Canajoharie ; they were taken prisoners together, and returned by the way of Quebec to Boston ; and whilst on board of the ship, he told his brother he wished his wife was married. It was in the year 1813.

Thomas Hammond. Witness was also a prisoner ; and Kesler, on their passage, said he wished he was home ; his brother Joseph said, what would you do with your wife ? and he replied he would have her out of the way.

On his cross-examination this witness says, that he does not recollect with certainty what he said, those words bear hardest upon his mind.

*George Sprucher.* Witness is half brother of the deceased, the same father, but not the same mother; he was at home at the time prisoner came to take the deceased away last November. Witness asked him where he was going, he told witness he was going to live close by his father's, who lived the other side of Rome. Prisoner started on towards Rome, when he left his mother's house; witness said he would make them a visit; prisoner said he would find them there if he came up; witness had determined to go up to see whether he or his wife were there or not, and inquired particularly where it was, but he has forgotten the particular name of the place; says the deceased was subject to fits; does not know but what she had to fall down with them; they never lasted long; witness never heard of his sister's death until about eight weeks after her decease; never knew her to take opium.

*Catharine Nellis.* Witness knew Caty Sprucher; she saw the prisoner at the time he came to take her away last November; they came to their house in a waggon, and witness told them it looks strange to see you two together; Caty asked witness what she thought about her going off with him; witness requested her to wait until they were in the house together, and she might mention it when he was present, and she would then give her opinion, at which time witness asked prisoner where he was going; he said he laid out to go to Rome; he hurried the deceased on, and said he wished to be back to a certain place, because a waggon was to be there; Caty

did not inform witness whether she would go or not; they went off towards her mother's, and witness saw no more of them.

*Hannah Flint.* Witness resides a little better than a mile from the widow Sprucher's, where she has lived eight years; last fall prisoner came to her house, and the deceased remained on the stoop or off; dark before the house; he wished to know where witness' husband was; he wanted him to go to Cherry Valley with a waggon; prisoner said it was ugly going; he did not say what he wanted the waggon for; they walked on the road to Cherry Valley a small distance; he went into the field with two pillow-cases, one under each arm, and after standing a little, she followed on, and that is the last witness saw of them; prisoner was some distance before her; and witness' husband afterwards said they might have gone across the field to shorten or cut off the road; witness says it was at the next house below where witness lives, where they turned off.

*James Ferguson.* Prisoner lives about one mile from where the Lunenburgh turnpike leads into the western turnpike; the deceased and prisoner came to his house on foot; prisoner wanted a horse for to carry him to the turnpike; witness let him have a horse for that purpose; the deceased complained that she was tired.

*Nancy Hulcomb.* Witness is acquainted with the prisoner: she first became acquainted with him at Palatine between two and three years ago; she and her husband were then keeping a tavern at Palatine, which she continued a while after the death of her husband; her husband died in September, and she left it in May, 1816; witness afterwards kept a boarding house in Al-

bany; prisoner boarded at her house, in Albany, about three months; she thinks he quit boarding there last October, and left some of his clothing with her; he was gone not more than three or four weeks before he returned for his clothes, when she had quit keeping house; while prisoner boarded with her, she learned he was a married man ; when he returned for his clothes he said his wife was dead; while he boarded with her at Albany, she has frequently heard him speak about his wife. Prisoner informed witness he was endeavoring to get a divorce from her ; he proposed marriage to the witness; the proposal was repeated more than once; she gave him no great encouragement; when he offered himself, he spoke of a divorce from his wife, and that he had made application for a divorce. Witness now resides in Schenectady; he called on her shortly after she came there, which was in December last.

On her cross-examination she says, he called at Schenectady to ask about his clothes ; he had gotten some of them before in Albany, and then took a coat; she has the residue of his clothes now ; says he did not mention to her a word about the circumstances of his wife's death.

*Hannah Van Woerman.* Witness became acquainted with the prisoner the fore part of last winter; he lived at her house in Princetown, county of Schenectady, for three or four weeks ; said not a word as to where he had come from, nor about his being a widower.

*Baltus Cook.* Witness is acquainted with prisoner, and has heard him say, that he was married; he said he would take his wife on a vessel and go off with her, or leave her ; witness does not know what he meant by it; this was about one year after he came out of the

SCHOHARIE
1817.

The People
v.
Kesler.

service; and at another time, whether after or before, witness does not recollect, he talked about getting a divorce or bill of her.

*Thomas L. Butler.* Witness lives at Cobus Kill; he saw Kesler and his wife in the fall of the year, at his father's house, on Sunday evening; they came there in a waggon; they staid out doors some time, and then came in; he paid his father one shilling, which they said was for a sling; when he came there he wanted to hire a waggon; he said he wanted to overtake two waggons, going to Hudson; witness took the waggon and carried them to Mr. Best's tavern; witness heard no complaint whatever of the woman respecting sickness.

*Thomas Butler.* Witness recollects to have seen the prisoner at his house last fall; he came there and said he was desirous of overtaking two waggons with some of his effects on board, and at his request, witness sent his son some distance down with prisoner and his wife; they had one or more pillow cases with them at the time; witness understood him to say, that he had been to the westward; thinks it was Rome, but is not certain; that he was going to Hudson, where he had lived before, to follow tayloring during the winter; that he had been living to the westward, and intended to return in the spring; they had either cider or sling at his house, whether the wife drank any of it or not he does not know.

*Henry Best.* Witness knows prisoner; saw him at the house of Peter Best; they had a sling of him when they first came there, between the hours of eight and nine o'clock; he saw him after his wife's death; witness did not observe who drank the sling.

*Peter Best.* The deceased died at his house; witness

understood from prisoner that he was from Rome ; witness calculated to take the corpse to her relations: in the evening when he came there, he asked whether witness had seen a couple of loaded waggons going by, that he did not know whether they had passed him or not. In the morning, the day after her funeral, when he went away, he said he left the clothes as a security for the funeral expenses, until he should return ; said that he was going to live at Hudson, and that he would return the latter part of that week, or the first of the week after, take the clothes and pay the bill ; but he never called nor sent ; prisoner called for a brandy sling, which he handed to the deceased ; does not know whether he drank any of it or not, nor whether she drank ; witness heard of no illness until in the night, when they went out of their room ; he concurs in the relation given by his wife, Catharine Best. Witness offered to fetch Doctor Kroomer, from Cobus Kill, after the deceased was taken ill ; prisoner said it was not worth while ; witness then told him he might have the horse, saddle, and bridle, to go for the Doctor, whenever he pleased ; he once took it.

On his cross-examination this witness said, prisoner never mentioned whose daughter the deceased was ; after her death he said the Sprucher's, on the Mohawk, Schoharie, and Cobus Kill, were distantly related ; prisoner went to the Doctor's one morning, before day light ; whether it was on Thursday, or Friday, he does not know. Witness named George Sprucher, Jost Sprucher, and John Sprucher, to him : he said they might be distantly related. Prisoner might have gone to the Doctor's on Friday, without witness's knowing of it.

SCHOHARIE
1817.

The People
v
Kesler.

*Sophia Youngs.* She saw the prisoner and the deceased, on Sunday, at her father's house at Cobus Kill, at 12 o'clock; no complaint of indisposition then; she drank tea with the family, in the afternoon; appeared in health; they left that, in a waggon, drove by Mr. Bear's negro man; witness, and Miss Bears rode with them to one Butler's; Mrs. Shafer, whose maiden name was Sprucher, lives between Butler's and her father's house, and is a daughter of Jost Sprucher; the deceased had mentioned, whilst at witness's house, that her maiden name was Sprucher; witness told her, her cousin lived there; and deceased asked her husband whether he was going to stop; he answered no, he was going to Butler's, and if his waggons were not there, they would go back and stay that night at Shafer's; prisoner went into Butler's, and on his return to the house, the deceased asked him whether he had heard of the waggons; he said they were five miles ahead; he asked the negro man to carry them farther, who refused to do it; the deceased got out with her bundles, being two pillow cases, and went on the stoop, which was the last witness saw of her.

On her cross-examination this witness says, he mentioned the waggons; does not know whether he intended to say that they were his own or not.

*Margery Bears.* Witness concurs with what Miss Youngs has said; as to what took place in the waggon; says that the deceased made no complaint of sickness at the time.

*Thomas Butler.* Witness, on being asked, told prisoner that there were loaded waggons ahead, about five miles.

*Peter G. Best.* Witness saw prisoner at Sharon, in

November; they stopped at his house; came there on foot; he told witness he was from Rome, or Pompey Hollow; witness asked him how he came to travel as he did: he said his waggons were to be at Cherry-Valley, with his furniture, on Saturday; and told witness, that they had passed there between two and three o'clock in the afternoon, and that he did not arrive until three o'clock; and that they had gone on to Hudson. Witness took them on the distance of nine miles, and every shed they passed they looked under it to see whether the waggons were there.

On his cross examination, he says this conversation was in the presence of his wife; he also told the witness he had been at Hudson, and had engaged work for the winter, and that he was then on his way there with his wife.

*Harmanus Peck.* Witness is a magistrate, residing in the city of Schenectady; says that he was sent for to come to the gaol of the county of Schenectady to take the examination of the prisoner; that when he came there he informed the prisoner that he had no authority to do it, but if he was willing he would take it, to which prisoner freely and voluntarily assented. The examination was then objected to by the prisoner's counsel, as no evidence of itself, under the statute, but not as a memorandum to refresh the memory of the witness; and on the witness' stating, that he had no doubt of the facts being as mentioned in it, and although he would not undertake to repeat it exactly as there written, yet it being in his own hand writing, taken at the time, and freely and voluntarily subscribed by the prisoner himself; after it was distinctly read to him, he did not hesitate in giving his evidence to read it as such, and then read it

SCHOHARIE
1817.

The People
v.
Kesler.

himself as follows:—The voluntary examination of Abraham Kesler, of the town of Canajoharie, in the county of Montgomery, relative to his having administered poison to his wife, saith, that he is about 26 years of age; that he was married to Caty Sprucher in the year 1812, who then lived with her step-mother, Eve Sprucher; that she had been delivered of a female bastard child, of which she said he was the father, when he married her; and after he was married, he immediately enlisted at Canajoharie, in the 13th regiment, for 18 months, and he served until the time expired; that he did not visit his wife from the time he married until last fall, some time in November last; he then called on her, and told her that he was about looking a place to live, and wanted her to go with him, which she consented to do; and he told a Mr. D. Youngs that he was going with his wife to Hudson or Lunenburgh; that in November last he started with his wife from Canajoharie, to go to Hudson, or some other good place to live; that his wife, when she went from Canajoharie, went a horseback about two miles, then a foot a small distance, then a horseback about one mile, and then on a waggon; the first night they staid at a Mr. Cook's, in the town of Sharon; the second night they staid at a Mr. Becker's, where they got some cider, and nothing else; they called for a supper, but could not get any; that before they came to Becker's his wife complained that she was sick, and continued sick, but did not vomit until after the doctor administered medicine; that he called on a doctor, whose name he thinks was Shepherd; that they arrived at Becker's on Sunday, and on Friday his wife died; that the doctor resided about two or three miles from Becker's; that he called on the doctor twice, and got

opium and pills ; that the first time he called on the doctor he got a piece of opium about as big as a hickory nut ; that he did not tell the doctor that she was in the habit of taking opium ; that the doctor inquired of him whether she was in the habit of taking opium, and he said he did not know ; that he administered the opium to his wife, and that after she had taken part of the opium, she let it fall in the chamber pot ; she died on Friday, and was buried on Sunday ; that on Monday he left the place ; that the people of the house did not tell him that his wife had requested her body to be taken to her mother's, in case she died, but that his wife mentioned it to him ; that since the death of his wife he has not been to see the step-mother of his wife or any of his friends, or wrote to them on the subject ; that the clothes of his wife were left at the place where she died ; that he has not bought or been in possession of arsenic for six months last past ; that at the time he started with his wife, he told his wife's step-brother, that he did not know but that he should go to Rome and live with his father ; and said that he did not tell any person that he had a waggon going on to Rome with furniture and goods ; he says that he has been acquainted with a Mrs. Holcomb about two years ; that he has made no overture of marriage to her, nor paid any attention to her as a suitor, nor conversed with her on the subject ; that he has never denied his marriage with Caty Sprucher ; that after his wife's death he went to Lunenburgh, where he remained only one day ; he then went to Guilderland and Princetown, where he has been ever since ; that he worked with a Mr. Van Wormer and for Mr. Waldron ; that since the death of his wife he has not mentioned her death to any person ; that previous to his wife's going

SCHOHARIE
1817.

The People
v.
Kesler.

SCHOHARIE
1817.

The People
v.
Kesler.

with him, he had been to see her four or five times, but did not stay with her at night; that he told the people where his wife died that his wife's mother was dead; that the doctor went in and examined his wife during her sickness; that he did not get any gin-sling, or any other thing for his wife to drink, except cider and water, during her sickness; he says he never objected to the doctor's calling and seeing his wife; when he went to see the doctor, he told the doctor that if his wife was better, he, the said Kesler, would call and see him, and inform him of it; but if he, the said Kesler, did not call by eleven o'clock, A. M., that then he wished the doctor to call and see his wife; that before the death of his wife he boarded with Mrs. Holcomb, in Albany, for several weeks; and he says that after his wife's death, he called at Mrs. Holcomb's, in Albany, and got some of his clothes; that he then told her that his wife was dead; that in about ten days after he left boarding with Mrs. Holcomb, he called at Mrs. Sprucher's to see his wife, and obtained her consent to go with him, as herein before stated; that he did not immediately, previous to his coming to Schenectady, make any engagement with a Mr. Tallman, or any other person, to go on to Rome, or take Mrs. Holcomb there; that last summer he applied to S. A. Foot, Esq. to obtain a divorce from his wife; that Mr. Foot told him that he could not obtain a divorce unless he could prove that his wife was guilty of adultery; he farther saith, that previous to his starting with his wife, he was informed and believed that his wife had had a connection with a man by the name of Roswell Scripture, with whom she had lived in Connecticut for about nine months; that on her way, the first day, she told the said Kesler that she had gone away

with the said Scripture, and lived with him as a house-keeper, but said that she had no carnal connection with him.          (*Signed.*)                    ABRAHAM CASLER.

*Abraham Keyser*, jun.   In the month of May last he discovered that the prisoner had his irons sawed off, and does not know of his making any effort to escape.

On his cross examination, this witness says that prisoner once returned the key, which he had forgotten, although it was not the only lock which fastened the door, as he, the witness, had a pad-lock at the bottom of the door which was locked at the time.

SCHOHARIE<br>1817.

The People<br>v.<br>Kesler.

### Prisoner's Testimony.

*Joseph J. Casler.*   Witness does not recollect the conversation on board of the sloop, mentioned by Thomas Hammond in his evidence.

*Roswell Scripture.*   The wife of the prisoner has kept house for witness, and was subject to fits, whilst she kept house for him, from July to December, 1814, she had the epelepsy, or fallen sickness sometimes three or four times in twenty-four hours.

The jury found the prisoner guilty by their verdict. The court sentenced him to be executed on the third Friday of October, 1817, between the hours of 10 o'clock in the forenoon and 2 o'clock in the afternoon.

Report of Wm. James M'Neven, M. D. and professor of chemistry in the University of New-York, made to his excellency governor Clinton, in compliance with his demand of my remarks at large on the scientific part of the testimony, in the case of Abraham Kesler, indicted for poisoning his wife with white arsenic and landanum, and found guilty by the verdict of the jury.

1. The scientific part of the testimony is contained in

the evidence of the physicians who saw the deceased before or after death.   Dr. Burton Carpenter was applied to for medicines during her illness, and saw her shortly before she died, for the first and only time.   Previously he had purchased powders to be administered to her, composed of opium, camphire and emetic tartar ; and early in the complaint, that is on Monday or Tuesday, gave prisoner half an ounce of opium ; but states on his cross-examination, that when he visited her on Thursday evening, when she appeared to him dying, he saw no symptom which led him to believe that she was dying because she had taken too much opium.

2. After having been buried two months the deceased was dug up to be examined.   Dr. James W. Miller was present at the opening of the body, and testifies " there appeared to have existed an inflammation."   Now inflammation proceeds from so many and such various causes, that physicians are very generally agreed nothing certain can be learnt from the appearance of it after death, especially when putrefaction of the parts is far advanced, as it was in this case of two months interment.   It is true, that if there is poisoning from arsenic, taken by the mouth, there must of necessity be inflammation of the stomach ; but the converse does not hold, and where there is inflammation there is no manner of necessity of its being from arsenic.   Any conclusion to be drawn from the appearance of inflammation in this case, must therefore depend for corroboration altogether on other facts.

3. Dr. Miller and Dr. Joseph White, though they evince considerable acquaintance with the subject of arsenical poison, and the best modes of detecting it, have, nevertheless, omitted so many important circumstances

in the experiments they made, and neglected other experiments so entirely, that their testimony is wholly unsatisfactory. Dr. James W. Miller found attached to the inner coats of the stomach, and in the smaller intestines, some particles of a vitreous appearance which showed white when scratched with a knife; some of those particles were placed on a heated iron and a dense white smoke arose from their combustion.

*Remarks.* In the first place the white dense smoke alone proves nothing. I placed corrosive sublimate, calomel, tartar emetic, oxide of bismuth, each of them on a heated iron, and they rose with a smoke more or less dense, and with most readiness in the order I have named them: the first and second very readily, the third and fourth when the iron was red hot. Now it will be recollected that one of these substances, namely, the emetic tartar, was given by Dr. Burton Carpenter to the prisoner for the purpose of being administered to the deceased.

4. Dr. James W. Miller put some of the same particles between two plates of polished copper, and placed those on the fire until they were brought to a red heat. On cooling he found the plates whitened towards their edges.

*Remarks.* I put oxide of tin, commonly called putty of tin, between two plates of bright copper, and surrounded it with a circle of powdered charcoal, after the best manner of making the experiment with arsenic, then brought the plates to a strong red heat, and the consequence was a whitish stain towards the edges of the copper. I made another experiment after the same manner, with calomel, and there appeared an irregular white-

ning towards the edges, but less distinctly than in the former case. I made a third experiment, with charcoal alone, and having raised the heat pretty high there was left in the place of the charcoal a pale brass coloured circumscribed spot, that appeared white in comparison of the red copper colour round it ; rubbing did not at all lessen this whitish stain. An experienced eye would perhaps distinguish all these stains from the whitening of arsenic ; but in a capital case I would not like to convict on a shade or colour.

5. In his cross-examination, Dr. James W. Miller accounts for there being no garlic smell discerned, when the white powder found in the stomach of the deceased was put on heated iron, and between the copper plates, by saying that tar was kept burning in the room, and that this, together with the smell of the corpse, might have prevented his discovering it.

*Remarks.* The true reason is not here assigned. Neither the odour of garlic nor the stain on copper is produced by the white oxide of arsenic, when heated, without the addition of some inflammable ingredient. If the white substance was really oxide of arsenic, and that it had been thrown on live coal, or on a hot iron, surrounded and confined by carbonaceous matter, a smell of garlic would infallibly have been felt; for then the oxide would have been at least partially reduced ; and it is in this, or the entirely metallic state, it burns with an aliaceous smell. To have omitted these precautions, or seemingly not to have known their indispensable necessity, proves a want of a familiarity with chemical experiments in the physicians, and tends very much to weaken our reliance on all their chemical conclusions. But even the smell of garlic, if not corroborated by other

concurring facts, would not have been enough, for hy-
drogen gas burns with a faint smell of arsenic.

6. Dr. James W. Miller took home about two tea
spoonfulls of the contents of the stomach, and diluted
them with a pint of water. He made experiments with
this fluid, and obtained a certain precipitate.

*Remarks.* The notes of the trial do not inform us
whether the doctor diluted the contents of the stomach
with distilled water, or clear rain water, or common well
water. If with the latter, little or no reliance can be
placed on the experiments; for there is no well water
whatever, even the best, but will afford a precipitate
with nitrate of silver. Dr. Miller performed with the
diluted contents of the stomach the experiment of Mr.
Hume, as modified by Dr. Marcet, and says there was a
precipitate of an orange colour. I often made the ex-
periment, and always obtained a yellow precipitate, such
as that obtained by Hume and Marcet. On the present
occasion I made the following : I took a glass of lime
water and presented to the surface of it a glass rod, dip-
ped in a solution of nitrate of silver, and another dipped
in aqua ammonia, there was immediately a copious pre-
cipitate of an orange brown colour by reflected light.
The experiment will succeed with or without ammonia.
The public journals acquaint us with the opinion of
Mr. Brande of the Royal Institution of London, occa-
sioned by a trial in Cornwall, of a similar nature, it
would seem, with this. He says that the yellow precipi-
tate which white arsenic produces in solution of nitrate
of silver, exactly resembled that which phosphoric acid
occasions, and that both are soluble in ammonia. Mr.
Brande concludes, that in any case of importance, no
reliance should be placed on the above test. I repeated

the experiment with the glass rods, only substituting phosphoric acid for an arsenical solution, and the nitrate of silver occasioned a precipitate, but not yellow : however, the phosphoric acid now in my possession is some recently procured from London, and I find it is mixed with nitric acid. To this circumstance may probably be owing the difference of colour in Mr. Brande's and my results.

7. Dr. Delaus White repeated the experiment of Dr. Miller, putting some of the white particles found in the stomach of the deceased on heated iron, and also between two plates of copper, but since he does not at all vary or correct the process, the observations already made, No. 5, apply with equal force to his testimony.

8. Dr. John Atwater mashed some of the particles on white paper, and says, " it had the appearance of arsenic." I deem it extremely difficult, if not impossible, to distinguish with certainty, any white mineral powder from another in such circumstances. He also says the white fumes are considered a test. Chemists do not deem them such where they are unaccompanied with a garlic smell.

9. Dr. Joseph White testifies, " that some of the fluid of the stomach was put into a phial containing a solution of sulphate of copper and sub-carbonate of pot-ash, and that the precipitate was darker than what takes place in the process for making Scheele's Green."

*Remarks.* The fact is, that Scheele's Green is never obtained by using sub-carbonate of pot-ash. To obtain that, pure or caustic pot-ash must be employed, and it should be first combined with the arsenic in a separate vessel, and then the sulphate of copper will be precipitated by the compound of a very remarkable green co-

four. But even this experiment is inconclusive. I took the expressed juice of onions, and added to it a solution of sulphate of copper. Immediately the whole was turned of a beautiful green not to be distinguished in appearance from that of Scheele's Green.

10. Dr. Joseph White repeated the experiments with the plates of copper; but with no other result than what was obtained in my experiments with oxyde of tin, &c. No. 4. He repeated the experiments of Dr. Miller, on the contents of the stomach; but we are not informed in what kind of water he dissolved them. He also looked for an orange coloured precipitate, which is not the characteristic one. He himself places no reliance on this experiment, and in that he is correct.

11. Dr. James Hadley, Professor of Chemistry, at Fairfield. His testimony is only approbatory of the experiments and opinions of Doctors Miller, Delaus, and Joseph White; and must partake of the same fate.

### General Remarks.

Some of the results obtained in the experiments of the physicians, are such as arsenic will afford, but not exclusively; nor can any reliance be placed on any one, or all of them, unsupported by others more decisive. I have shown that the same, or some very similar to them, proceed from other and innocent substances. At the same time the unerring signs of arsenic were not at all, nor were the most proper means taken to procure them.

The only thing to be relied on, in the opinion of the best chemists, is the exhibition of the metal itself in its metalic lustre and state. This thing is by no means difficult to perform, and I show it every winter to my

class, together with all the other experiments on arse-nic in comparative approximation.    In the metallic state the arsenic is clear and unequivocal, and it could have seldom been placed more easily beyond all possi-ble doubt, than in the present case ; because it appears there was enough of the white matter found in the sto-mach, for every necessary trial.    Indeed, the weight of a single grain is sufficient, and I usually employ this quantity only, in order to show my students with how little it can be effected.    A given quantity of the white powders have been mixed with three times its weight of black flux, and carefully put into a tube of thin glass eight or nine inches long, a quarter of an inch wide, and coated at its lower end, which should be hermetrically closed for one or two inches.    The upper end should be loosely stopped and the coated end placed upright in a chaffing dish of red hot coals.    In a little time, if there be arsenic in the tube, it rises with its metallic lustre, and adheres to the sides of the tube.    The tube should be broken as soon as cool, and the reduced metal laid on a hot iron ; a dense smoke then arises, and a smell of garlic is perceived.    The arsenic might next be far-ther identified by putting a small quantity between two polished plates of copper, surrounded by powdered charcoal, and exposing them to a low red heat.    If the included substance be arsenic, a white stain will be left on the copper.    In this way every part supports another, and there is no possible ambiguity.    But as those expe-riments, which are alone certain, were omitted, and no experiment performed with unexceptionable accuracy, I must give it as my opinion, confining it however to the scientific part alone of the testimony, that the in-dictment, for poisoning with arsenic, is not substantia-

ted by the evidence of the witnesses. All which is re-spectfully submitted.

SCHOHARIE<br>1817.<br><br>The People<br>v.<br>Kesler.

Wm. Jas. MacNeven.

*New-York, Sept. 26th,* 1817.

Mr. Bay, from the committee on courts of justice, to whom was referred the message of his excellency the Governor, with the accompanying documents, in the case of Abraham Kesler, convicted of the murder of Catharine Kesler, his wife, at a Court of Oyer and Terminer, held in and for the county of Schoharie, on the 12th and 13th days of September last, report:

That they have entered upon the examination of this case with deliberation and care, which its nature de-mands, and with a full sense of the responsibility which their duty imposes upon them. They forbear to go into a full detail of the testimony, and in a short view which they are about to take of the subject, will consider the facts as familiar to all.

The first and most important question in this case is, did the deceased come to her death by the effect of poi-son?

In answer to this question, the committee must refer to the testimony of the respectable physicians who were present at the opening of the body of the deceased. A strong opinion is there expressed by them of the pre-sence of arsenic in the stomach at the time of the dissec-tion.

On the correctness of that opinion, a shade of doubt has been thrown by the letter of Dr. William James M'Neven, professor of chemistry in the University of this state, to his excellency the Governor. Of the merits of this letter, or of the opinions which it attacks, we

SCHOHARIE 1817.

The People
v.
Kesler.

readily confess ourselves incompetent judges ; we there-- fore addressed a letter to doctors Beck, Bay, Low and Stearns, of the city of Albany, requesting that they would lend their attention to the facts contained in the documents accompanying the message, with a view of giving your committee their opinion upon the scientific part of the testimony. The following questions were proposed, to which they afterwards returned the answer annexed to them respectively.

*Quest.* 1. (By the Committee.)   From the testimony it appears that the deceased and the prisoner came to the house of Peter Best, and had a glass of " sling" between 3 and 9 o'clock in the evening, and the deceased was taken with puking about 10 o'clock that night ; would arsenic taken in the sling have produced that effect so soon ?

*Ans.* by Drs. Stearns, Low, Bay and Beck in the affirmative.

*Quest.* 2. Was the quickness of its operation owing to the large quantity taken ?

*Ans.* by the same.   It probably was.

*Quest.* 3. Will not that depend upon the state of the stomach as to the quantity of food it contained ?

*Ans.* by the same.   A full stomach would probably retard the operation, and an empty one accelerate it.

*Quest.* 4. If the dose administered was arsenic, and that does a large one, how do you account for the convalescence of the deceased on Wednesday ?

*Ans.* by the same.   If arsenic in a large dose was administered to the deceased, her partial convalescence may be readily accounted for on the supposition that the previous vomiting and purging may have discharged the principal part of the poison : the opium given by the

prisoner may also have operated to alleviate the symp-
toms.

*Quest.* 5. The deceased being convalescent on Wednesday evening, on the supposition that the arsenic had been administered on Sunday evening, would death have been produced had the poison not been repeated?

*Ans.* by the same. It might.

*Quest.* 6. From the symptoms immediately preceding her death, as detailed by Catharine Best and Dr. Burton Carpenter; did the deceased, if poisoned at all, die by the effects of opium or arsenic, or under the operation of both?

*Ans.* by the same. We do not think ourselves justifiable in answering this question.

*Quest.* 7. Might not the symptoms stated in the testimony have arisen from morbid affection, without any excessive dose of either arsenic or opium?

*Ans.* by the same. The symptoms described by the witnesses are usually the effects of arsenic. Other diseases, however, where no poison has been taken, have produced similar symptoms.

*Quest.* 8. Was the substance found in the stomach of the deceased, the remains or part of any of the medicines furnished to the prisoner by Dr. Burton Carpenter?

*Ans.* by the same. If by the words " the substance," in this question, is meant the white particles examined by the medical witnesses, we reply that it is improbable.

*Quest.* 9. Would any of the medicines, thus furnished, produce the symptoms which attended the deceased during the illness that preceded her death?

*Ans.* by the same. They might.

*Ques.* 10. What is your opinion of the substance found in the stomach of the deceased, without regard to experimental tests applied by the physicians?

*Ans.* by the same. We have no information before us to warrant our giving an answer to this question.

*Ques.* 11. Is there sufficient evidence, satisfactorily to show that the said substance was arsenic, arising from the evidence of the physicians, taken in connection and combined with other testimony, given on the trial?

*Ans.* by the same. We beg leave to refer to our answer to the sixth question.

*Ques.* 12. Are all the tests of the presence of arsenic made manifest in the experiments of Doctor Miller and the other physicians?

*Ans.* by the same. If by this question is meant, whether all the tests of arsenic were used? our answer is *no ;* the reduction of the metal, the most important test, was omitted. If by this question is meant, whether the appearances exhibited by the experiments indicated the presence of arsenic ? we answer *generally they did.*

*Ques.* 13. Considering the length of time the subject had remained a corpse, before the dissection by Dr. White, is it conclusive, that the appearances of the stomach and other parts of the body, were the effects of poison, and not morbid action?

*Ans.* by the same. We attach no importance to the appearances found after death, in this case.

*Ques.* 14. Is there any other metallic or mineral substance, experimented in the same manner, that would produce the same or similar results?

*Ques.* 15. Is there any animal or vegetable substance, or liquid, ordinarily used as food, which, if taken into the stomach of the deceased shortly before her death, would have caused the same appearance in the stomach de-

scribed by the physicians, or would have produced the same or similar results of the experiments made by them?

*Ans.* to question 14 and 15, by the same. In answer, we beg leave to refer to the accompanying experiments made by Dr. Low.

*Experiments made at the request and in the presence of a Committee of the Legislature of the State of New-York, and of several Physicians, on the Oxydum Album Arsenici, &c.*

### EXPERIMENT 1st.

All the solution glasses were previously well washed in *distilled water.*

1st. A quantity of common pump water was poured into glass No. 1.

2d. An equal quantity of snow water into glass No. 2. And

3d. An equal quantity of distilled water into glass No. 3.

To each of these samples of water, placed on the same stand, and in the same light, a few drops of very pure nitrate of silver were added.

In No. 1. a copious white precipitate immediately occurred. In neither No. 2. or No. 3. did there occur the least perceptible precipitate. After waiting sufficient length of time, about the 10th of a grain of *muriate of ammonia* was added to Nos. 2. and 3.; the white precipitate instantly occurred. The object of this experiment was to show that experiments made with a view of ascertaining metallic precipitates, ought to be made with pure water: the snow water No. 2. in this instance indicated no impurity.

### EXPERIMENT 2d.

1st. I took ten grains of white oxyde of arsenic and thirty of subcarbonate of pot-ash, and by means of a lamp, dissolved them in distilled water. I put a portion of this solution into a clean glass, and diluted it with a quantity of distilled water.

2d. I next took a common white onion, and bruised and macerated it in distilled water. This infusion was filtered and put in a clean glass.

To No. 1. or arsenical solution, two glass rods, one dipped in a solution of nitrate of silver, the other in aq. ammonia, were approached at the same moment, an orpiment yellow precipitate, with a slight tinge of green immediately fell, the green almost instantly disappeared. The same process was followed with No. 2. or infusion of onion; but with so slight a variation of colour (if any) that it could not be named, and no precipitate at all.

### EXPERIMENT 3d.

A solution of white oxyde of arsenic was made in distilled water.

1st. A portion of this solution was put into a clean glass, and a little pure potash in solution was added to it.

2d. A portion of the infusion of onion was put into another glass to each of these, was added, by drops, a quantity of a solution of sulphate of copper. In No. 1. a bluish green precipitate appeared. In No. 2. no obvious green color appeared, and no precipitate.

3d. A small portion of the solution of arsenatic of potash was put into a glass and diluted with distilled water; on adding a few drops of a solution of sulphate of copper, a beautiful green precipitate instantly formed, resembling what I should call Scheele's green. This experiment has been twice repeated with the same effect.

## EXPERIMENT 4th.

I took eight pieces of copper, about 1 3-4 of an inch square, had them planed and burnished on one side.

No. 1. I surrounded 5 grains of oxyde of bismuth, with a circle of charcoal finely powdered and moistened with a little oil, on the polished surface of one plate, placed the polished surface of another accurately upon it, and bound them tightly together with a binding wire.

No. 2. I treated 5 grains of oxg. muriate of mercury in precisely the same manner.

No. 3. Five grains of tartrite of antimony and pot-ash were treated in the same manner.

No. 4. consisted of 5 grains of white Oxyde of arsenic, managed precisely as in the former cases. Nos. 1. 2. 3. 4. as just described, were subjected to an equal degree of heat, for the same length of time, (ten minutes.)

On examination, the pair of plates, No. 1, exhibited indeed a *slight whitish* spot in the centre of the plates, when the bismuth was in contact.

Nos. 2. and 3. had the copper hue in different places impaired, and in some places permanently a little whitish, surrounded by a narrow irradiant disk.

No. 4. exhibited the unequivocal silver-like alloy.

All these plates were carefully cleaned, rubbed with a little course paper, and subsequently with a little fine chalk.

I should have no hesitation in stating, that the experiments 1, 2, 3, and 4. all of which produce changes on the surface of the copper, decide the question as to the appearance of the alloy of copper and arsenic, in which there is, comparatively, a marked difference of aspect from the other three.

## EXPERIMENT 5th.

1st. Oxyde of bismuth, and tartrite of antimony, and potash, were each exposed in equal quantities, on an iron heated to redness; they were all, to a certain extent, volatilized, but without any sensible aliaceous odour; a portion of each was also placed on ignited charcoal, gradually volatilized, but no odour.

2nd. An equal quantity of white oxyde of arsenic was placed on the heated iron, the white fumes rose in profusion; a slight but aliaceous odour was present. I will not be certain, however, that some small particles of carbonaceous matter might not have adhered to the iron, which gave rise to it. But on ignited charcoal the aliaceous odour was strong and pungent.

From Scheele's own directions for preparing the green, (vide Murray, vol. 3. page 356. 2d ed.) we are of opinion that Dr. McNeven is inadvertently in error.

When we consider the high standing of the medical gentlemen who examined the body, in the profession of which they are, and for many years have been, distinguished members ; supported as they are, on every essential point, by the gentlemen of the profession in the city of Albany, already named ; we are bound to say that full reliance may be placed on the correctness of their opinion. If this testimony be not satisfactory, how are we, *in any case,* to convict the murderer, who produces the death of his victim by means of poison ? The fatal dose is never administered in the presence of a witness. It is only by the examination of the body, after death, by scientific and practical men, that the cause of death, in those cases, is ascertained, and the perpetrator brought to punishment.

Your committee could not, however, direct the execution of the convict upon this testimony alone : their opinion has been influenced entirely by taking it in connection with the other testimony in the cause. On the 16th of November last, after a desertion of his wife, from the day of his marriage, a period of upwards of five years, Abraham Kesler appeared at the house of Eve Sprucher, the residence of the deceased, with offers of reconciliation. He seduced her from her friends and her home, under the false pretences of wishing to live with her ; of having procured a residence at Rome, or in the neighbourhood of that place, near his father's ; and of having then, on the road to Rome, two waggons loaded with his effects ; and on their journey towards that place, he led her a distance from the direct rout to an obscure

SCHOHARIE
1817.

The People
v.
Kesler.

tavern in an unfrequented neighbourhood.    These facts taken in connection with the repeated threats and declarations of the convict, and the other testimony in the case, your committee are compelled to believe, too clearly indicate the diabolical design meditated by him against this unfortunate woman.    Why, in her illness, he refused to send for a physician when so strongly pressed by the family of Peter Best : why he discovered an unwillingness to permit that family to attend her during this scene of sickness, of suffering, of death : why he administered a puke, as he pretended he did, on Wednesday morning, when the deceased was evidently convalescing : why he affected an ignorance of her relatives and family, and why he required the excessive quantity of opium, which, from the testimony of doctor Burton Carpenter, it appears he procured, are questions which (again taking into view the other testimony in the case) your committee are unable to answer in any manner favourable to the innocence of the convict.

The motives which induces the commission of the higher offences, and especially of the crime of murder, is always required to be ascertained.    And here, too, your committee are constrained to say, that in the case under consideration, that motive is but too clearly found in the testimony of Nancy Holcomb ; to this woman the convict had made offers of marriage ; and when she says, that in those offers, she gave him " no great encouragement," we are led to the conclusion that his marriage to the deceased was the great if not the only objection ; and experience has shown, that men, unrestrained by a sense of religious and moral obligation, when placed in this situation have been impelled to the perpetration of the most deadly crimes.

Your committee are therefore of opinion that the verdict of the jury was correctly given—that there is no substantial reason for interposing the pardoning power of the Legislature : and they have instructed their chairman to bring in a bill in conformity to this report.

The prisoner was executed.